THE PEOPLE, *ex rel.* The Mutual Life Insurance Company of New York, *vs.* THE BOARD OF SUPERVISORS OF THE CITY AND COUNTY OF NEW YORK.

Mutual Life Insurance Companies, incorporated previous to the year 1849, are liable to taxation upon their accumulations, as capital.

And where a company of that description having a fund, employed in its business, amounting to nearly three millions of dollars, was taxed by the assessors upon only $100,000, of personal property, *it was held* that the tax commissioners, on reviewing the assessment roll, had the power to add $900,000 thereto, making the amount of personal property belonging to the company, liable to taxation, one million of dollars, and that the board of supervisors was right in refusing to restore the original assessment, and in confirming the judgment of the commissioners.

A judgment, entered at a special term, denying an application for a *mandamus,* to compel the board of supervisors to restore or reduce the assessment to the sum of $100,000, and to apportion or fix the tax upon that amount, instead of one million of dollars, and to correct the tax accordingly, was therefore affirmed.

APPEAL, by the relators, from a judgment entered at a special term, denying their application for a mandamus. The opinions below contain a full statement of the facts. The following opinion was given, on deciding the motion at the special term:

" MITCHELL, J. Most, if not all, of our moneyed corporations had formerly a fixed capital, the amount of which was specified

in their charter. When, therefore, the revised statutes in 1830 directed taxation to be on the capital of moneyed corporations, it was this certain fixed capital which was intended, so far as corporations having such capital were concerned; and it was accordingly held that the taxation should be on that capital alone, and on the whole of it, whether they had reserved funds exceeding that capital, or had sustained losses which would reduce it. But more recently, mutual companies have arisen without a fixed capital, but with funds reserved as sacredly and avowedly as the capital of the old companies, as security for those who would deal with them. These mutual companies, with an excusable anxiety for their own interest alone, strongly urged that they had no capital, and so were not liable to any taxation. This court decided that the reserved funds thus set apart were their capital, and that they were to be taxed on the amount of those funds. In 1849, (Apl. 10, ch. 308,) the legislature by a general law authorized the formation of mutual companies for various purposes, including life and health insurance; but required that no joint-stock company, authorized under that act, should do business in the city of New York, or county of Kings, with a less capital than $150,000, and that no marine or fire insurance company should commence business in the city of New York or county of Kings until it had premiums from at least 100 applicants, amounting to $300,000 in case of marine companies, and $200,000 in case of fire companies; and that in other parts of the state the premiums to be paid or secured should amount to $100,000, and that no company for life or health insurance on the mutual plan should commence business until a cash capital of $100,000 should be paid in and invested.

On 29th June, 1853, an act was passed, (ch. 469,) to take effect in twenty days thereafter, that any mutual life insurance company incorporated previous to the act of 10th April, 1849, should be subject to taxation in the same manner as if it were incorporated under said general law with a capital of $100,000, as required by the sixth section of the general law. To take the view of this law most favorable to the relators, this act was

intended to make these companies liable to taxation in the same manner as if they had a fixed capital of $100,000. Under the decisions before referred to, and the statutes up to the last date, such a company would be liable to taxation on that amount, although its capital should in fact be reduced to a much smaller amount, and would not be liable to taxation on any larger amount, although it should have reserved funds far exceeding that amount. But on the 21st of July in the same year, by an act passed on that day, and which took effect immediately, the legislature changed this rule—so changed it as to leave the law as it stood before, when the capital of a company was reduced, unless its clear annual income was equal to five per cent of the capital, but changed it when the company had surplus profits or reserved funds beyond its capital; and declared that its capital, together with those surplus profits or reserved funds, (except ten per cent of its capital and except its real estate,) "should be assessed and taxed in the same manner as the other personal and real estate of the company, unless such company shall be entitled to commute," and shall elect to do so. (§ 10 *of* 1 *R. S.* 415, *as amended by an act of* 1853.)

This act was passed to amend the general law contained in the revised statutes as to taxation, and applies in its terms to "every company liable to taxation," (§ 10 as amended,) or when restricted by the revised statutes, to "all moneyed or stock corporations" deriving an income or profit from their capital or otherwise. (1 *R. S.* 414, § 1.) It has been decided that these companies come within that description. The effect of this act was, that (while before companies with a fixed capital could be taxed only on their capital, although they had large surplus profits and reserved funds) after this act was passed those companies would be taxed, both on their capital and on those surplus profits or reserved funds. Such has been its practical operation; and banks and other companies, which before had held their surplus profits exempt from taxation, have since been compelled to pay taxes on them. These companies can claim no special exemption in their favor; they are within the words of the act, and within its spirit. The object of the act was to in-

crease the taxable property in the state, and to raise more money by taxation; and it was part of the same policy which led to the passage of another act on the same 21st July, 1853, (ch. 651,) imposing an additional state tax of ¾ of a mill for the fiscal year commencing October, 1853, and of ⅓ of a mill for the year commencing October 1, 1854. The state needed more revenue, and this was discovered by the 21st of July of that year, and both these measures were resorted to in order to supply that need. This, too, explains why the act of 21st July should be so drawn as to qualify an act passed so short a time before as the previous 29th of June. The public faith required the payment of the public debts, and those whose business it was to point out the ways and means of doing this, discovered the necessity of resorting to these measures when they were adopted, and probably did not long before.

It was urged that these companies could not be intended to be included in the act of 21st July, because that act allows companies which do not receive in any year a clear income of five per cent on their capital to commute, on paying five per cent on their clear income. This act is only an amendment of 1 *R. S.* 414, &c., so that it is to be read as part of the revised statutes; and then it might as well be urged that the company was not liable to any part of the chapter of the revised statutes as to taxation, and so that the company was exempt from all taxation. This ninth section gives the special privilege of commuting to those who can bring themselves within its provisions; but to those who cannot, it is as if it were not in the law. If the relators' construction of the act of June 29th, 1853, is so far correct that they are to be taxed as if they had a capital of $100,000, then their profits are to be calculated on that sum, for the purpose of ascertaining whether they can commute or not, and then they can come within that section, if their profits are not too great. The memorial of the relators to the legislature in 1853, submitted in this case, states that "a single life insurance company in this city had, on the 1st May, 1853, a reserved fund of $2,500,000, which must accumulate to many millions to meet at maturity the claims on policies now in force." Is it

not likely that this disclosure led to the act of July 21st, taxing reserved funds of all companies, and forcing the legislature, if it would tax all property not devoted to charitable or religious purposes, not to leave these newly discovered treasures any longer exempt? And if—as the memorial supposes—this fund must increase to many millions in the hands of single companies, there may be some reason to apprehend that these companies would divert from their ordinary channels such large sums that trade would be embarrassed, and the companies obtain a control not very favorable to the simplicity which should characterize our institutions? These considerations certainly would not make these companies such favorites with the legislature as to exempt them from taxation, which the widow and the orphan, who have any property, must bear.

The assessors assessed this company at $100,000, supposing that, under the law, they could not assess any more of their property; but they did not make that the estimate of the value of the property. The tax commissioners ascertained this fact, and that the reserved funds of the company exceeded $1,000,000, and assessed the company at that last sum. The company appealed to them, and to the supervisors of the county, to restore the rolls to their former condition; but both bodies refused, and the company now applies to the court for a mandamus to compel the supervisors to make the restoration. The powers of the tax commissioners were considered in the case of Adriance *vs.* these same defendants, and it was held that the tax commissioners could not raise the valuation of real estate above the actual valuation placed upon it by the assessors; because they had power only to add to the roll, and assess, according to law, any real or personal estate liable to taxation which had not been assessed by the assessors, (*Laws* 1850, *ch.* 121, § 21, *amended* 1851;) and that real estate once valued by the assessors was assessed by them, although assessed below its real value. But in this case the assessors did not determine the value of the relator's personal estate at all; but, acting under a mistake of the law, they omitted to assess its value, and placed in the roll, not its value, but a sum which they supposed the law required them

to put there without any exercise of their judgment. Under the act of July 21, 1853, they were to place in the fourth column of the assessor's roll "the amount of the capital stock of the company, and of all its surplus profits, or reserved funds, aforesaid." (§ 3.) The assessors did insert in the column the nominal capital, but omitted the surplus profits, or reserved funds, which the law made liable to taxation. These profits or funds were personal estate, liable to taxation, which had not been assessed by the assessors, and so were not within the jurisdiction of the tax commissioners to "assess according to law," and to "add to the assessment roll." (*Laws of* 1850, *Ch.* 121, § 21.)

The motion for a mandamus is denied, with $10 costs ; but to enable the relators to carry the question further, they may have an alternative mandamus, stating all the facts contained in these papers on which this motion is founded, so that the defendants may demur thereto, and let an order be entered denying a peremptory mandamus ; and proceedings may be stayed on the execution until the decision of the general term."

*J. Blunt,* for the appellants.

*By the Court,* ROOSEVELT, J. This is a claim on the part of one of only two particular mutual life insurance companies, for the law, although seemingly general, applies to no others, to be in effect exempt from taxation. With a fund employed in their business amounting, as appears, to nearly three millions, they claim that by an act of the legislature, passed, we may presume, at their special instance, in June, 1853, they were to be taxed as if their capital was limited to the comparatively insignificant sum of $100,000.

By the act referred to it was provided that any mutual life insurance company, incorporated before the adoption of the general insurance law of 1849, should be subject to taxation in the same manner as if it were incorporated under the general law with a capital of $100,000. Construing this act in connection with the previous legislation of the state, and harmonizing as far as practicable with the principles of equal justice, the courts,

and as I conceive very properly, held that the specially chartered companies created under the old monopoly system, were to be placed upon the same footing—and no better—as those organized under the general law: which, instead of limiting the taxation of the new associations to $100,000, merely limited their power to commence business until they had on hand a fund of at least $100,000.

The $100,000 provision, it was held, had the same meaning both in the act of 1853, and in the general act of 1849, to which that of 1853 referred—and in the act of 1849 its object confessedly and indisputably was to fix a minimum instead of a maximum —a minimum of capital and not a maximum of taxation.

The act of June, 1853, was no doubt adroitly framed in the interest of the two companies in question. Its language, without being direct and striking, was, upon close consideration, susceptible of, if it did not grammatically require, the interpretation subsequently sought to be put upon it. Having failed, however, as we have seen in the courts, to establish that interpretation, another attempt, it would seem, by or on behalf of the companies, was made upon the legislative department in the form of a quasi appeal from the judiciary; and in March, 1855, an act was accordingly passed by the legislature of that year to declare the true intent and meaning of their predecessors in the act of June, 1853; in other words, an act of the legislature to reverse the act of the court. The relators, however, are now met by a new difficulty. Before the act of June, 1853, went into operation, the legislature, it appears, overlooking, we may presume, what they had less than twenty days previously done—not an uncommon occurrence in the closing scenes of a legislative session—passed a new tax law applicable to all incorporated companies, chartered or general, liable to taxation, " on their capital or otherwise." By this act not only the capital stock proper of all such companies, but their " surplus profits or reserved funds exceeding 10 per cent," were expressly directed to be assessed and taxed in the same manner as the other personal or real estate of the county. Here, then, be the construction of the act of June what it may, was a palpable repeal in July of its only

provision, and a substitution of a more comprehensive enactment in its place—a circumstance wholly overlooked, it would seem, by the authors of the declaratory act of 1855. That act, declaring, as it did, "the true intent and meaning" of the act of June, 1853, and of that act only, merely directing what construction should be given by the courts to an act which, in effect, had long since been repealed, and left the general law of July, 1853, untouched, to be applied to "every company" alike, whether organized under the old system of special charters, or the new system of free trade. And why should any distinction be made between them? Especially, why should the two particular companies in question be taxed only on $100,000 each, while every other company in the same city, and standing on the same footing, is assessed on its "reserved funds?" The constitutionality of such legislation—even if expressly intended and clearly expressed—might well be doubted. But the court will not presume that the legislature intended to violate either the spirit or letter of the constitution, and will not, therefore, give to their acts a construction which would imply such intention. Equality of taxation is a fundamental principle of our government, which no legislature, in the absence of the most explicit provisions, will be presumed to have intended to violate. The assessors, it seems, in the case of the present company, misled by the peculiar wording of the act of June, 1853, taxed them only on $100,000. But the tax commissioners, on reviewing the assessment roll, added $900,000, making the amount one million instead of one hundred thousand; and the board of supervisors subsequently, on the application of the company, refused to restore the original assessment, and confirmed the judgment of the commissioners; upon which the company sued out a *mandamus* to compel the supervisors to reverse their action in the matter; and the case now comes up on a demurrer to the answer of the supervisors; or rather, on an appeal to the general term of the court from the decision of the judge at special term, sustaining the supervisors.

What, then, we are to inquire, are the powers of the tax commissioners? Can they, in such cases, correct the errors of the

ward assessors ? They have power, it is said, to add to the assessment roll and assess any real or personal estate, liable to taxation, which may not have been assessed, but they cannot increase the valuation as made by the assessors. As to real estate, which is always specific, the rule may be so. Where the local officers, after inspecting a particular house and lot, put upon it a certain value, there may be some reason, though none of a very striking character, for not permitting the commissioners to raise such value. But what reason is there for such a restriction in the case of personalty? The assessors, in estimating the taxpayers' personal property, do not value any particular stock of goods, or household furniture, or bonds and mortgages, but personal estate generally. When, therefore, in such cases, they put the amount too low, it is invariably, almost, an error not of undervaluation but of omission. And it is conceded the power of the tax commissioners, however limited in other respects, extends at all events to supplying the omissions of the ward officers, whether the property omitted be personal or real. Now the supervisors in their answer allege—and the allegation is admitted by the demurrer—that in the assessment of the personal property of this company, there was an omission, among other items, of $2,343,681 in bonds and mortgages, which were " part of the capital, surplus profits, or reserved fund of the company," and which the assessors did not set down or estimate, in consequence of the erroneous impression they labored under, not as to the value of these securities, but as to the law of the state, applicable to them. They mistook the law, and under that mistake, inserted only the nominal capital of $100,000. In other words, they omitted the " surplus reserved fund :" they omitted it altogether. Was it not then both the right and the duty of the commissioners to supply the omission? The only error of the commissioners, as it seems to me, an error, however, of which the relators have no reason to complain, was, not in adding, but in adding too little, in adding less than one million, instead of more than two.

It has been said that if the commissioners are allowed to possess this power of raising the amounts set down by the assess-

ors, great injustice may at times be done to particular individuals, as no provision is made by law for giving notice of the contemplated augmentation. And does not this objection apply with equal force to the addition of an omitted house, as to the addition of an omitted mortgage? Suppose a case in which the assessors should have omitted wholly the personal estate of a particular individual; may not the commissioners insert it? Even the counsel of the company at first conceded that in such a case the commissioners might insert the personalty so omitted. And yet the argument, from want of a notice, is the same in both instances. All that can be said properly on this point is that the statute is defective, and that the defect, although remedied in actual practice by the commissioners, should be corrected as matter of right, by the legislature.

The relators, it appears, had notice. They argued before the commissioners, and they appealed to the supervisors. They were heard by both, and were not considered as wronged by either. And such, too, after full hearing, was the opinion of the special term.

There is clearly no equity in the relators' case. They seek to establish for themselves a special privilege, at the expense of the rest of the community, and incompatible with the equal rights of all other companies, but one, engaged in the same business. Such claims, to be available, must be clearly made out; and statutes passed to sustain them (if so passed at all) being at variance with common right, are to be strictly construed. So construing the statutes cited by the relators, the position taken by them is as untenable in law as in equity.

Judgment of special term affirmed, with costs.

[NEW YORK GENERAL TERM, May 7, 1855.    *Roosevelt, Clerke* and *Cowles,* Justices.]